IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL ZOMBER, Petitioner, v. UNITED STATES OF AMERICA, Respondent. | : | CIVIL NO. 06-CV-460 CRIMINAL NO. 03-46-2 |

**MEMORANDUM OPINION & ORDER**

**RUFE, J.** **March 19, 2007**

Presently before the Court is Defendant-Petitioner Michael Zomber's Petition for Writ of Habeas Corpus [Doc. #130] filed under 28 U.S.C. § 2255. Upon review of the numerous briefs and exhibits in this matter, over 1000 pages of testimony and argument, and the relevant legal authorities, and after a day-long evidentiary hearing, the Court finds that Petitioner's claims are without merit. Accordingly, for the reasons that follow, the Petition for Writ of Habeas Corpus will be denied.

## I. PROCEDURAL BACKGROUND

This Petition is before the Court following a jury trial in which Petitioner was convicted of one count of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. The charge arose out of Petitioner's participation in a scheme to defraud a gun collector, Joseph Murphy, by fabricating and mailing letters that stated that potential buyers were willing to pay inflated prices for certain guns, even though those buyers did not exist. A comprehensive factual recitation is included in the Court's Memorandum Opinion dated February

28, 2005.[1] For the purposes of this Opinion, the Court will recite only those facts immediately relevant to the instant Petition.

On December 15, 2003, after an almost four-day trial, a jury convicted Petitioner of the lone count in the Indictment. Subsequently, on March 23, 2004, Petitioner filed a motion to vacate his conviction, in which he alleged, among other things, ineffective assistance of counsel and Brady/Giglio violations by the government. In its Opinion addressing the motion, the Court cited the preferred policy in the Third Circuit that ineffective-assistance-of-counsel claims be raised on collateral attack through a § 2255 petition, rather than on direct appeal.[2] Accordingly, the Court denied the motion on that ground without prejudice to Petitioner's right to raise those claims in the instant Motion.[3] As to all other grounds, the Court denied the motion on its merits.[4]

On May 20, 2005, Petitioner filed a second motion to vacate his conviction and for a new trial, in which he alleged a Brady violation by the government for failing to disclose a settlement agreement between his co-conspirator, Richard Ellis,[5] and the victim, Joseph Murphy. After holding a hearing on the matter, the Court denied Petitioner's motion, finding that he failed to demonstrate that the government had not supplied the agreement to defense counsel at trial, Gilbert Scutti.[6]

---

[1] United States v. Zomber, 358 F. Supp. 2d 442, 444–48 (E.D. Pa. 2005).

[2] Id. at 454.

[3] Id.

[4] See id. at 448–61.

[5] On February, 24, 2003, Ellis pleaded guilty to federal criminal charges that stemmed from the same conspiracy underlying the charges against Petitioner.

[6] United States v. Zomber, 379 F. Supp. 2d 770, 773 (E.D. Pa. 2005).

On September 9, 2005, Petitioner filed a third motion to vacate his conviction,[7] in which he again alleged a Brady violation by the government for failing to disclose letters Murphy wrote to Microsoft Chairman Bill Gates (the "Gates letters") and the deposition transcript of Murphy's personal assistant, Nancy Garvey. On January 10, 2006, by way of lettered request, Petitioner sought reconsideration of the Court's previous Order denying his second motion to vacate his conviction. The Court denied both of Petitioner's motions from the bench.[8] Petitioner was thereafter sentenced to 30 months in prison, three years of supervised release, a $75,000 fine, and a $100 special assessment.

Petitioner filed a timely Notice of Appeal informing the Court that he was appealing the judgment of conviction and sentence to the Third Circuit Court of Appeals.[9]

On January 27, 2006, Petitioner filed the instant 62-page Petition, pursuant to 28 U.S.C. § 2255, alleging that his trial counsel provided ineffective assistance and additional Brady violations by the government, and seeking the vacatur of his conviction and a new trial.

On March 27, 2006, following a hearing to determine restitution, the Court entered an amended judgment to include a sentence of restitution in the amount of $1,100,000. On March 31, 2006, Petitioner filed a second Notice of Appeal informing the Court that he was appealing the

---

[7] Petitioner entitled this motion, "Second Motion for Vacatur of His Conviction Based on the Government's Failure to Timely Disclose Brady Material," but it was actually his third motion to vacate his conviction. Under normal circumstances, the Court would not be willing to consider multiple motions to vacate. In this case, however, the Court considered Petitioner's numerous motions because he was represented by newly retained counsel post-trial, who had to acquaint himself with the pretrial and trial proceedings, as well as the voluminous discovery materials and trial record.

[8] The Court issued an Order reaffirming their denial on January 23, 2006 [Doc. #122].

[9] Notice of Appeal from J. and Conviction [Doc. #117] (filed Jan. 18, 2006).

amended judgment of conviction and sentence, which included the newly entered restitution.[10] Upon Petitioner's request, both appeals were stayed by the Court of Appeals on June 13, 2006, pending the resolution of the instant § 2255 petition.

On October 5, 2006, the Court held an evidentiary hearing on the instant Petition in which Petitioner presented testimony from numerous witnesses in support of his claims. The hearing was followed by further briefing by both parties. The Petition is now ready for review.

## II. DISCUSSION

### A. Ineffective-Assistance-of-Counsel Claims

Petitioner claims that his conviction and sentence should be vacated because he was denied his Sixth Amendment right to the effective assistance of counsel at his trial. He bases this claim on a list of alleged acts or omissions by his trial counsel that allegedly fell below an objective standard of reasonableness and prejudiced him. After articulating the applicable law, the Court will address individually each of Petitioner's ineffective-assistance-of-counsel claims.

#### 1. Legal Standard

The standard for determining whether trial counsel's assistance was ineffective is well settled. In Strickland v. Washington,[11] the United States Supreme Court announced that in order to prevail on a claim of ineffective assistance of counsel, the defendant must establish that: (1) counsel's representation was deficient; and (2) counsel's deficient performance prejudiced the defendant.[12]

---

[10] Notice of Appeal from the Am. J. & Conviction [Doc. #168] (filed Mar. 31, 2006).

[11] 466 U.S. 668 (1984).

[12] Id. at 687.

To satisfy the first prong of this test, the defendant must prove that his attorney's representation fell below an objective standard of reasonableness,[13] making errors so serious that counsel was not functioning as the "'counsel' guaranteed the defendant by the Sixth Amendment."[14] Strategic and tactical decisions, such as which witnesses to call, whether and how to conduct cross-examination, which legal arguments to present at trial, and which pretrial and trial motions to make, are within the province of the attorney after consultation with the client.[15] Moreover, "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."[16] In preparing his defense and making strategic decisions concerning that defense, counsel is required "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'"[17] Accordingly, when counsel makes such strategic or tactical decisions, "'[o]nly when [his] behavior revealed ineptitude, inexperience, lack of preparation or unfamiliarity with basic legal principles [will these] actions amount to ineffective assistance of counsel."[18]

To satisfy the second prong, the defendant must prove that his attorney's errors were "so serious as to deprive the defendant of a fair trial" with a reliable result,[19] and show that "there

---

[13] Id. at 688.

[14] Id. at 687.

[15] See United States v. Ciancaglini, 945 F. Supp. 813, 817 (E.D. Pa. 1996) (citing ABA Standard 4-5.2(b)).

[16] Yarborough v. Gentry, 540 U.S. 1, 8 (2003).

[17] Stevens v. Del. Correctional Ctr., 295 F.3d 361, 370 (3d Cir. 2002) (quoting Strickland, 466 U.S. at 691).

[18] Id. (quoting Gov't of the Virgin Islands v. Weatherwax, 20 F.3d 572, 579 (3d Cir. 1994)).

[19] Strickland, 466 U.S. at 687.

is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different."[20] "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."[21] Rather, the relevant inquiry is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."[22]

The defendant must make both of these showings to establish that his conviction "resulted from a breakdown in the adversary process that renders the result unreliable"[23] and, therefore, should be vacated. There is no requirement that a court first consider the alleged deficiency of counsel's representation and, thereafter, its supposed prejudicial effect. In fact, when appropriate, a court may dispose of an ineffective-assistance-of-counsel claim by first evaluating the prejudice prong. As the Supreme Court instructed in Strickland:

> If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.[24]

In evaluating counsel's performance, courts "must be highly deferential" and should make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances

---

[20] Id. at 694.

[21] Id. at 693.

[22] Id. at 695.

[23] Id. at 687; see id. at 700 ("Failure to make the required showing of *either* deficient performance or sufficient prejudice defeats the ineffectiveness claim." (emphasis added)).

[24] Id. at 697. The Third Circuit Court of Appeals has endorsed this approach. See United States v. Booth, 432 F.3d 542, 546 (3d Cir. 2005); United States v. McCoy, 410 F.3d 124, 132 (3d Cir. 2005).

of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."[25] Furthermore, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[26] This requires the defendant to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."[27] Accordingly, "'only the rare claim of ineffective assistance of counsel . . . should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance.'"[28]

**2. Petitioner's Specific Ineffectiveness Claims**

*a. Failure to Object to Testimony on "Correct," "Proper," or "Ethical" Conduct*

Petitioner's first ineffective-assistance claim is based on trial counsel Scutti's failure to object to the testimony of certain government witnesses—Joseph Murphy, John Gangel, and Martin Lane—regarding what is "correct," "proper," or "ethical" conduct in the antique-firearms business. Petitioner claims that this testimony was irrelevant to any issue of consequence at trial, was unfairly prejudicial, and that the witnesses who offered the testimony were not qualified as experts on ethics and, therefore, were incompetent to offer such testimony.

*1) Failure to Object Based on Irrelevancy*

Petitioner's argument that such testimony was irrelevant and prejudicial, and that his

---

[25] Strickland, 466 U.S. at 689.

[26] Id.

[27] Id. (internal quotations omitted).

[28] United States v. Kauffman, 109 F.3d 186, 190 (3d Cir. 1997) (quoting United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989)).

counsel was ineffective by failing to formally object to it, is unfounded. As Petitioner himself notes, the issue was discussed by counsel and the Court at trial and it was determined that the issue was relevant, though certainly not dispositive of whether or not a crime had been committed. In fact, Scutti noted his objection to such testimony and argued that an ethical violation does not amount to a federal criminal offense.[29] The Court agreed with Scutti, but permitted both parties to argue whether there was an ethical violation, with full understanding that proof of a mere ethical violation would not constitute proof that a federal crime had been committed.[30] As a result of Scutti's raising objections, the Court explicitly precluded the government from arguing that an ethical violation constituted an indictable offense.[31] The Court considered the prejudicial effect of the challenged testimony, but ruled that both parties were permitted to present evidence concerning the ethical implications of the alleged conduct, since such evidence was relevant to state of mind, the motivations underlying the alleged conspiracy, and Petitioner's argument that his conduct amounted to mere puffery.[32]

Accordingly, Petitioner's argument that Scutti provided deficient representation by failing to preclude this testimony is unconvincing. First, Scutti made an attempt to preclude the testimony on this point by Gangel and Lane during trial, making his specific irrelevance argument known to the Court and government counsel during a colloquy in the absence of the jury. Petitioner

---

[29] N.T. Trial 12/12/03 [Doc. # 42], at 13. He also suggested that he previously raised an objection to testimony of this sort when a question was put to Gangel concerning improper conduct. He said, "Or even improper. Someone's perception of improper is in the same category. That's why I objected to the question being put to Gangel." Id. at 14; see also N.T. Evidentiary Hr'g 10/5/06 [Doc. # 192], at 180.

[30] N.T. Trial 12/12/03, at 13–14.

[31] Id. at 14.

[32] Id. at 14–15.

cannot successfully argue that Scutti should have continued to object to the testimony even after the Court assessed that it was relevant. Scutti's decision to withhold further objection was not unreasonable; it would have been more unreasonable for Scutti to continue to object to testimony already deemed relevant and admissible.

As for the question put to Murphy, Scutti explained at the evidentiary hearing that he perceived the question asked of Murphy differently than those asked of other government witnesses like Gangel and Lane.[33] Accordingly, he deemed it unobjectionable and chose not to raise an objection at the time.[34] Scutti's perception and resulting decision are both reasonable. The question put to Murphy was, arguably, different than those put to the other witnesses. When questioning Murphy about the agency agreement he had entered with Ellis, Goldman asked, "Under the agreement that you had with Mr. Ellis, would it be proper for him to get his commission, being the ten percent, but also profit on the other end by purchasing low and selling high?"[35] This was a question specifically about the propriety of Ellis's conduct *under the agency agreement* as opposed to a question about general ethical or proper conduct when dealing in the antique-firearms market. In that way, it is different from those questions presented to Gangel and Lane, and Scutti had a valid reason not to object when it was put to Murphy. Petitioner has not overcome the presumption that, under the circumstances, this decision was one of sound trial strategy. Consequently, the Court cannot find that Scutti was deficient by not objecting to the challenged question.

---

[33] N.T. Evidentiary Hr'g 10/5/06, at 177–80.

[34] Id. at 179.

[35] N.T. Trial 12/10/03 [Doc. # 40], at 79–80. This is the only instance of Murphy being asked a question concerning proper or ethical conduct that Petitioner has identified. See Pet. for Writ of Habeas Corpus, at 11.

Moreover, whether or not Scutti's alleged failure to object to the testimony fell below an objective standard of reasonableness, Petitioner cannot establish the second prong of the Strickland test on this point. Even if Scutti had vehemently objected to the relevance of such testimony each time it was offered, the Court would have overruled his objection, and the jury would have been permitted to hear the testimony. Likewise, an objection based on Rule 403 of the Federal Rules of Evidence—arguing that the unfair prejudicial impact of the testimony substantially outweighed its probative value[36]—would not have succeeded. Even had these objections been made, the jury would have heard all of the testimony in question. Consequently, Petitioner cannot prove that there is a reasonable probability that the outcome of his trial would have been different had Scutti objected to the relevancy of the challenged testimony.

*2) Failure to Object Based on Competency of Witnesses*

Likewise, the Court is unpersuaded by Petitioner's argument that the testimony on what is ethical, proper, or correct in the antique-firearms business was expert testimony and, therefore, was inappropriately offered by lay witnesses. Lay-opinion testimony is admissible "so long as it is (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue."[37] The testimony challenged here was offered by people with extensive experience in the antique-firearms community, and who, through their participation in that community, were able to perceive what type of conduct was generally considered acceptable and proper. Their testimony was based on their perceptions of

[36] The Rule creates a presumption of admissibility when evidence is relevant and only provides for the exclusion of evidence based on potential prejudice when the danger of unfair prejudice *substantially outweighs* the probative value. See United States v. Universal Rehab. Servs., Inc., 205 F.3d 657, 664–65 (3d Cir. 2000) (*en banc*).

[37] United States v. Polishan, 336 F.3d 234, 242 (3d Cir. 2003).

what was acceptable and appropriate conduct in that community, and it was offered to help the jury understand that the conduct of which Petitioner was accused was not an acceptable form of puffery or sales talk in that community. The witnesses did not testify specifically about any formal set of ethical rules in the industry or offer their testimony as ethics experts. Thus, the testimony was admissible under Rule 701 of the Federal Rules of Evidence, and would have been admitted over any objection by Scutti. As such, it was wholly reasonable for Scutti to decide that an objection would be futile. Accordingly, his decision not to object to the testimony does not constitute deficient representation.

Again, whether or not Scutti's failure to object to the testimony could be considered deficient, Petitioner cannot establish that but for the omission, there is a reasonable probability that the result of his trial would have been different. Objection to this testimony on Rule 701 grounds would have been futile and would not have changed the character or quality of the evidence considered by the jury when it convicted Petitioner. Moreover, even if the Court had precluded testimony by these witnesses about what is ethical or proper in the antique-firearms industry, the jury would have nonetheless been able to make their own conclusions based on other admitted evidence. That evidence included Petitioner's own sworn statement, in which he admits that Ellis's conduct was "unethical."[38] Therefore, Scutti's decision not to object did not render the result of the trial unreliable.

Consequently, the Court will not vacate Petitioner's conviction based on his first claim of ineffective assistance of counsel.

---

[38] See Ex. G-37 at Trial 12/11/03, Sworn Statement of Michael R. Zomber, Oct. 1, 2001, at 8.

*b. Failure to Adequately Cross-Examine Martin Lane*

Petitioner next claims that Scutti provided ineffective assistance by failing to object to Lane's qualification as an expert, challenge his methodology, and question his motives for testifying, and by inadequately impeaching him as a witness. He claims that Scutti had available to him a plethora of information that could have been used to undermine or even preclude Lane's testimony as an expert. In addition to questioning Lane's qualifications to be an expert witness, the methodology he employed, and his bias or motives for testifying, Petitioner alleges in detail numerous "prior bad acts" that he claims Scutti could have used to destroy Lane's credibility. Instead, Petitioner claims, Scutti "stipulated" to Lane's qualification as an expert and failed to sufficiently attack his methodology, credibility, and reliability.[39]

*1) Failure to Challenge Expert Qualification*

Petitioner claims that Scutti was ineffective by stipulating to Lane's qualification as an expert witness. In fact, Scutti did not stipulate to Lane's qualification as an expert, but rather, made the calculated decision not to challenge his qualification.[40] As Scutti noted at the evidentiary hearing, he was pleased to hear that Lane would be testifying and making value an issue at trial, and he wanted to elicit certain information from Lane on cross-examination.[41] Therefore, Scutti had no reason or desire to preclude Lane from testifying. Scutti also believed that the Court was nonetheless

[39] The Court notes that several of the allegations made in the Petition were not known to anyone, including Scutti, until one month *after* Petitioner's trial. Consequently, any information arising out of Lane's January 2004 civil deposition cannot be considered. Petitioner cannot expect his trial counsel to have acted on information that did not come to light until after the trial.

[40] While this is most likely a distinction without difference, it is worth noting that no formal stipulation was entered, a fact which may not be apparent from the Petition.

[41] N.T. Evidentiary Hr'g 10/5/06, at 285, 288.

likely to qualify him as an expert over any objection.[42] As a result of these considerations, the decision not to challenge Lane's qualification as an expert in order to ensure his testimony at trial was a reasonable strategic choice, and it does not constitute deficient representation.

*2) Failure to Challenge Methodology*

Petitioner also claims that Scutti was ineffective by failing to challenge the methodology used by Lane in appraising the relevant antique firearms. At the evidentiary hearing held related to the instant Petition, however, Scutti explained that he did not challenge the methodology because he was interested in demonstrating to the jury that the valuation of these antique guns was "not rocket science" and that anyone could do minimal research or investigation to establish the value of the guns.[43] Through Lane's testimony, Scutti sought to illustrate the variability and constant fluctuation of value in the antique-firearms market, and to demonstrate that most purchases in the market are "ego-driven."[44] This decision, once again, is well within the category of strategic decisions left to be made by counsel at trial and must be given deference by the Court. It was not objectively unreasonable for Scutti to have made the strategic decision to allow Lane to testify without challenging his methodology and, therefore, does not constitute deficient representation.

*3) Failure to Adequately Impeach*

Petitioner further argues that Scutti should have impeached Lane's credibility by

---

[42] Id. at 269, 288.

[43] Id. at 289; see id. at 283.

[44] See id. at 283.

cross-examining him with myriad evidence of prior bad acts and bias. He focuses on a number of allegedly false appraisals previously issued by Lane, an allegation that Lane transported modern firearms across state lines without a valid license, an allegation that Lane converted a firearm to his own use and benefit, and claims of bias.

Petitioner's claims demonstrate an expectation that Scutti was required to conduct an extraordinarily in-depth and extensive investigation into any possible prior conduct by any witness who was to testify at trial. As Petitioner notes, it is unclear whether Scutti even knew of most of the conduct offered as grounds for impeachment. Rather, he claims that Scutti should have "followed up investigative leads"[45] or attempted to discover this information, which is only tangentially related to the case, "through investigative means."[46] While "'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary,'"[47] he is certainly not required to investigate every possible lead—even if he had these leads to begin with—related to every trivial and collateral issue in the case. Counsel cannot, however, be asked to perform simultaneously the tasks of Perry Mason, Paul Drake, and Della Street. He must make a reasonable strategic decision about which leads to follow—those that are likely to result in the acquisition of important information—and which leads to let lie. In this case, Scutti chose not to follow certain leads—if indeed he had those leads Petitioner claims that he did—in order to focus his attention on the issues that would be most important at trial. He did not provide

---

[45] Pet. for Writ of Habeas Corpus [Doc. #130], at 24.

[46] Id. at 26.

[47] Stevens v. Del. Correctional Ctr., 295 F.3d 361, 370 (3d Cir. 2002) (quoting Strickland v. Washington, 466 U.S. 668, 691 (1984)).

deficient representation by making that informed decision, even if these alleged prior bad acts may have been discovered through an exhaustive investigation.

Moreover, even if Scutti had embarked on the fishing expedition that Petitioner claims he was required to conduct and had available to him all of the information that Petitioner claims he should have used to impeach Lane, it would have been consistent with Scutti's strategy to avoid impeaching Lane with those allegations. Under the Federal Rules of Evidence,[48] Scutti would have been limited to asking Lane about the alleged prior bad acts, and would have been forced to accept Lane's answers. One of Scutti's overriding strategies was to avoid questioning any witness about incidents for which the defense had no supporting documentation or could not offer such documentation under the Rules.[49] Without the ability to offer any extrinsic evidence about Lane's alleged misconduct, it was consistent with Scutti's strategy to avoid such questioning. Additionally, throughout the trial, Scutti was loyal to his strategy to avoid a "slash and burn" interrogation of government witnesses.[50] This was especially true in the case of Lane, whose testimony he wished to use to advance his puffery argument and to establish that the values antique firearms is perpetually indeterminable.

Scutti's decision not to impeach Lane with those alleged prior acts of which he was actually aware and to avoid potentially unfounded claims of bias, were strategic ones that must be afforded great deference by this Court. Scutti competently cross-examined Lane and believed he made some powerful points on cross-examination, while operating within the boundaries of what

---

[48] See Fed. R. Evid. 608.

[49] See, e.g., N.T. Evidentiary Hr'g 10/5/06, at 175, 226, 249, 264, 302.

[50] See id. at 220, 265, 267.

he could accomplish due to factors such as Petitioner's incriminating sworn statement.[51] As Scutti's pretrial communications with Petitioner illustrate, his cross-examination of Lane was strategically and carefully considered even before trial.[52] At trial, he pursued the issues he thought most relevant and beneficial to Petitioner's case—those of fluctuating and indeterminate value—and ignored those that he thought were unhelpful—those concerning unfounded allegations of prior bad acts and bias.[53] His decisions are not objectively unreasonable and do not constitute error "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."[54] Accordingly, Scutti's representation was not deficient in this regard.

*4) Absence of Sufficient Prejudice*

As discussed above, Petitioner has not established that Scutti's representation of Petitioner, related to the testimony of Lane, was constitutionally deficient under Strickland. Even if the Court considered any aspect of his representation deficient, Scutti could not be found to have provided ineffective assistance—that is, even if Petitioner were able to overcome the presumption that Scutti's decisions were ones of sound trial strategy, he remains unable to establish that they sufficiently prejudiced him to constitute ineffective assistance. Even if Scutti had done everything Petitioner claims that he was constitutionally required to do, there is not a reasonable probability that the result of the proceeding would have been different.

The Court additionally notes that Petitioner has not sufficiently established that a

---

[51] See N.T. Evidentiary Hr'g 10/5/06, at 286–89; see also id. at 261–64.

[52] See Ex. SC-4 at Evidentiary Hr'g 10/5/06, Email from Gilbert Scutti to Michael Zomber (Nov. 6, 2003).

[53] See N.T. Evidentiary Hr'g 10/5/06, at 286–302.

[54] Strickland, 466 U.S. at 687.

challenge to Lane's qualifications would have been successful and precluded Lane's expert testimony. Even if he has established that a challenge would have precluded Lane's testimony as an expert, Petitioner's claim would not succeed. As the Court previously noted in its Opinion dated February 28, 2005, Lane's testimony, consisting primarily of his opinion of the value of certain antique firearms, "was not necessary to the government's case."[55] The government was not required to show that the victim actually suffered a loss to prove that Petitioner was guilty of mail fraud.[56] Therefore, the foundation of the government's case would have been unaffected had Lane been precluded from testifying or been more thoroughly impeached.

*c. Failure to Object to Hearsay Evidence*

Petitioner further argues that Scutti was ineffective by failing to object to the admission of prior out-of-court statements made by Murphy and recorded in a memorandum offered by the government as Exhibit 15 (the "Murphy Memo"). According to Petitioner, Murphy's statements were "rank hearsay" that would have been excluded from evidence after an appropriate objection, and the failure to make such an objection constituted ineffective assistance.[57]

It is well established that a decision not to object to certain testimony is within the "exclusive province of the lawyer," and, as long as counsel has a rational basis for his decision, the

---

[55] United States v. Zomber, 358 F. Supp. 2d 442, 461 (E.D. Pa. 2005).

[56] See, e.g., United States v. Copple, 24 F.3d 535, 544 (3d Cir. 1994) ("[T]he government does not have to show that the victims actually suffered a loss to satisfy the elements of the mail fraud statute . . . . Proof of actual loss by the intended victim is not necessary.").

[57] Pet. for Writ of Habeas Corpus, at 37.

Court is "without authority to second-guess counsel's judgment call."[58] Scutti explained at the evidentiary hearing that, while he realized that the memorandum was objectionable, he did not object to its admission because there were parts of it he wished to use on cross-examination.[59] Specifically, Scutti explained that he wished to use the memorandum to illustrate that the absence of a written agreement between Murphy and Ellis memorializing their agency agreement was surprising, given Murphy's proclivity to memorialize even poolside discussions.[60] He also explained that he wished to emphasize Murphy's statement suggesting that he did not rely on or even know of Zomber prior to his purchase of the Walker 1009.[61] His cross-examination of Murphy at trial bolsters his explanation at the evidentiary hearing.[62] As a result, Scutti's decision not to object to the admission of the Murphy Memo was not deficient, and Petitioner's claim of ineffective assistance on this ground is, therefore, without merit.

*d. Failure to Argue Against the Alleged Plot to Induce Purchase of Both Walkers*

Next, Petitioner argues that Scutti was ineffective by failing to argue that the evidence demonstrated that Petitioner had no intent to induce Murphy to purchase the Walker 1009 as part of a plot for Ellis to later sell the Walker 1010 to Murphy at an inflated price.

This is, once again, an argument challenging Scutti's trial strategy and the Court will

---

[58] See Gov't of Virgin Islands v. Weatherwax, 77 F.3d 1425, 1436 (3d Cir. 1996) (internal quotation omitted).

[59] N.T. Evidentiary Hr'g 10/5/06, at 184–86.

[60] Id. at 185–86.

[61] Id. at 186.

[62] See N.T. Trial 12/10/03, at 204–06; cf. N.T. Trial 12/11/03 [Doc. # 41], at 83.

defer to Scutti's decision about which points to emphasize and which points to avoid, unless that decision was unreasonable. Scutti's decision, however, cannot be considered unreasonable under the circumstances. Given the chaotic snippets of evidence that Petitioner proffers to support this particular claim, the Court cannot be persuaded that Scutti's strategic decision to minimize "collateral" or "frivolous" testimony was not a reasonable tactic given his well-planned strategy.[63] Hence, Scutti's representation related to this point was not deficient.

*e. Failure to Adequately Cross-Examine Fred Sweeney*

Petitioner further argues that Scutti was ineffective by failing to cross-examine Fred Sweeney about possible alternative explanations for the $25,000 payment he received from Zomber. At trial, the government argued that Zomber paid Sweeney $25,000 to write a letter to Richard Ellis that was intended to induce Murphy to purchase the Union and Liberty guns. Petitioner argues that Scutti should have presented evidence that the payment may have been for a rosewood case and/or a Colt Army flask, or other purchases made from the Bud Firth Collection. Petitioner also claims Scutti should have cross-examined Sweeney about his friendship with Ellis and about why Ellis would charge him $25,000 to sign a one-page letter.

Not only was Scutti's cross-examination of Sweeney not deficient, it was more than reasonable under the circumstances. First, Scutti thoroughly questioned Sweeney in accordance with his trial strategy, attempting to elicit testimony about the variability and subjectivity of value in the antique-firearms market and to challenge Sweeney's credibility.[64] Second, further examination on

---

[63] See N.T. Evidentiary Hr'g 10/5/06, at 264; see also, e.g., id. at 175, 225–26, 229.

[64] See, e.g., N.T. Trial 12/12/03, at 89–90, 97–98.

these points may have actually prejudiced Petitioner since there is no reason to believe Sweeney would have wavered from his unqualified direct testimony that Petitioner paid him to write the letter. Finally, at the evidentiary hearing, Scutti acknowledged that pursuing such a course of questioning became exceptionally problematic given Sweeney's disposition on the stand—that is, that Sweeney was crying during his testimony and confessed that "this was the worst thing" he had ever done.[65] Considering the circumstances of Sweeney's testimony, it was reasonable for Scutti to avoid this line of questioning and, instead, focus on those points he found most relevant. Accordingly, he cannot be found to have been ineffective for his cross-examination of Sweeney.

*f. Failure to File Any Pre-Trial Motions*

Next, Petitioner argues that Scutti was ineffective for failing to file any motions before or during the trial. This is yet another argument questioning Scutti's trial strategy and has no merit. Petitioner cannot successfully argue that he was deprived of the counsel guaranteed by the Constitution because Scutti made a strategic decision to challenge the evidence at trial, rather than flood the Court with motions of questionable or no merit. There is no requirement that trial counsel file pretrial motions in any case, but this is especially true in a case where the Court would have denied the motions and dealt with the issues at trial as they arose, after considering the evidence as it developed during the proceedings.[66] Scutti's reasonable decision to forego pretrial motion practice

[65] See N.T. Evidentiary Hr'g 10/5/06, at 194; N.T. Trial 12/12/03, at 83 ("It's probably the worst decision I ever made in my life. When I wake up in the morning, I think about it and go to the doctor, and get some tranquilizers and sleeping pills and I'm embarrassed by what I did.").

[66] Moreover, it should be noted that Scutti raised several pretrial objections with the Court, including a challenge to evidence concerning gun sales that were not referenced in the Indictment. See N.T. Trial 12/9/03 [Doc. # 44], at 7–8, 9, 17–18. Petitioner cannot fault Scutti for not filing motions with the Court when he argued their substance before the Court on the first day of the trial.

cannot be considered deficient under the circumstances of this case.

*g. Failure to Seek Enforcement of the Defense's Trial Subpoena*

Petitioner further argues that Scutti was ineffective for failing to enforce the trial subpoena requiring Murphy to produce certain documents. According to Petitioner, Scutti should have demanded the production of those documents deemed irrelevant or inapplicable by Murphy's attorney.

But once again, this is merely an attempt by Petitioner to challenge a reasonable strategic decision made by Scutti when faced with the realities of the trial. The decision of whether to challenge the production of documents was one to be made by Scutti within his discretion. Murphy, through his attorney, produced numerous relevant documents that provided the information necessary for Scutti to present an effective defense. Scutti deemed the production sufficient, and his determination that seeking further enforcement of the subpoena would have been fruitless, a waste of time and resources, and/or unnecessary does not amount to ineffective assistance. Furthermore, Petitioner has not and cannot establish the second prong of Strickland on this point. The information that may have been included in the additional documents would not have further bolstered Petitioner's defense so much that its non-production casts doubt on the jury's verdict. Accordingly, the decision not to further pursue the subpoena did not constitute ineffective assistance.

*h. Failure to Further Cross-Examine Murphy About Pennsylvania Use Tax*

Petitioner further argues that Scutti was ineffective by abandoning his line of questioning about the Pennsylvania use tax when cross-examining Murphy, even after the Court sustained the government's objection on relevancy grounds. Petitioner claims that exposing

Murphy's failure to pay the use tax would have impeached his testimony on direct examination.

Again, this argument must fail because it was within Scutti's discretion to decide to abandon this line of questioning after the Court ruled it irrelevant. Whether or not Scutti may have been able to convince the Court that the testimony was relevant by offering a vigorous argument for its admissibility, he was not required to make such an argument and could have chosen not to do so for any number of reasons. Choices as to which arguments should be forcefully pursued with the Court are left to counsel to be made reasonably, and it was reasonable—and, more accurately, mandatory—for Scutti to move on in his cross-examination of Murphy given the Court's ruling. Consequently, Scutti's compliance with the Court's ruling does not constitute deficient representation.

*i. Failure to Demonstrate that Petitioner was Not on NRA Award Committee*

Next, Petitioner argues that Scutti was ineffective by failing to present evidence rebutting the government's argument that Petitioner was a member of the NRA Committee that awarded Murphy a gold medal for the Walker set, and that he personally ensured the award was given to Murphy in order to make him believe he had purchased a valuable set. Petitioner points to a letter written by Philip Schreier in June 2004, over six months after the trial, stating that Petitioner was not on the committee and did not financially endow the award. Petitioner also claims that he specifically requested that Scutti call Schreier as a witness at the trial.

Scutti's decision not to call Schreier as a collateral witness was in comport with his overall trial strategy and was a strategic decision that this Court cannot deem deficient. At the evidentiary hearing, Scutti repeatedly stated that it was his intention not to present an independent

defense case or call any collateral witnesses.[67] In fact, Scutti specifically noted that he did not call Schreier because he felt it was a collateral issue, and that calling him would be less effective than arguing that the government simply had no case.[68] Furthermore, Scutti's decision was based on, at least partially, the fact that Petitioner had admitted in his sworn statement that he had cooperated with Ellis to develop a proposal to have the National Treasure medals presented to Murphy.[69] Faced with the possibility that Schreier's testimony would, therefore, be false, it may have been unethical for Scutti to present the testimony. As such, it is entirely reasonable for Scutti to have decided it was imprudent to call Schreier, since his testimony would have contradicted a fact that Petitioner practically admitted in his own sworn statement.[70] As it is well within counsel's discretion whether or not to call certain witnesses, and a decision not to call a witness may be questioned only if it is objectively unreasonable, Scutti's decision to avoid this issue does not constitute ineffective assistance. Considering the underlying facts, it was not objectively unreasonable for Scutti to choose not to call Schreier, but instead to focus on his challenge to the sufficiency of the government's evidence, in accordance with his predetermined trial strategy.[71]

*j. Failure to Use Information Obtained by Private Investigator*

Petitioner further argues that Scutti was ineffective because he decided not to use

---

[67] See N.T. Evidentiary Hr'g 10/5/06, at 229 ("[T]o call these collateral witnesses as my defense made much less sense than being able to stand up and say the Government doesn't have a case here."); see also, e.g., id. at 175, 225–26, 237, 264.

[68] Id. at 226.

[69] Id. at 237.

[70] Ex. G-37 at Trial 12/11/03, Sworn Statement of Michael R. Zomber, Oct. 1, 2001, at 19.

[71] See N.T. Evidentiary Hr'g 10/5/06, at 229.

information obtained by private investigators at a March 2003 gun show in Texas—specifically, statements Murphy allegedly made at the show claiming that the Walker 1009 and 1010 were worth $1.25 million and $1.2 million, respectively. Petitioner claims that Scutti should have cross-examined both Murphy and Lane with this information and failing to do so amounted to deficient representation.

Once again, Petitioner challenges a strategic decision Scutti made during the course of the trial. Pretrial emails illustrate, and Scutti's testimony at the evidentiary hearing confirmed, that Scutti reviewed the investigative report and considered its use at trial.[72] At the time of trial, however, Scutti made the strategic decision not to offer the statements on cross-examination or otherwise, because he did not believe that presenting the statements would benefit Petitioner's case.[73] Scutti specifically explained that he did "not want to call two or three witnesses to get in to [sic] a he said she said about what Murphy said at a gun show as my only defense."[74] As Scutti acknowledged, "These are strategies that you kick around, and then as you get in to [sic] the reality of the trial, sometimes you don't do them. That's what trials are."[75]

While Petitioner claims the information obtained by private investigators provided a "devastating and unimpeachable area of cross-examination,"[76] he clearly ignores the credibility issues involved in offering the information at trial. As Scutti explained many times at the evidentiary

---

[72] See Exs. SC-3 & SC-4 at Evidentiary Hr'g 10/5/06, Emails from Gil Scutti to Michael Zomber.

[73] See, e.g., N.T. Evidentiary Hr'g 10/5/06, at 224–25, 231, 239–40, 243.

[74] Id. at 243.

[75] Id. at 242.

[76] Pet. for Writ of Habeas Corpus, at 44.

hearing, Murphy was a formidable witness who was able to deflect and avoid most probing questions and who easily earned sympathy from those in the courtroom.[77] If Murphy denied that he had made the statements, the credibility of the private investigator who obtained this information and testified at the evidentiary hearing, Edward Skaggs, would be at issue. Considering the testimony given at the evidentiary hearing, a credibility battle between Murphy and Skaggs would probably have been ill-advised, as Skaggs' testimony was shaky, at best.[78] As such, if Murphy denied the allegations and the jury found Skaggs' testimony lacking credibility, then questioning Murphy about the statements that he allegedly made at the gun show could have harmed Petitioner's defense. Scutti made these evaluations and weighed his options, ultimately making a reasonable strategic decision not to use the information. While Petitioner may disagree with Scutti's ultimate decision, or hindsight may suggest that introduction of the alleged statements may have furthered Petitioner's cause, neither of these facts is enough to overcome the deference the Court must apply to reasonable strategic decisions. Consequently, Scutti's decision not to use the alleged statements does not constitute deficient representation and, therefore, cannot provide the basis for an ineffective-assistance-of-counsel claim.

*k. Failure to Use the December 5, 2001 Settlement Agreement*

Petitioner's final ineffective-assistance claim is based on Scutti's failure to use, or even realize that the government had provided in discovery, the settlement agreement between Ellis

---

[77] See, e.g., N.T. Evidentiary Hr'g 10/5/06, at 175–76, 220, 221, 227, 249–50, 254, 266.

[78] See, e.g., id. at 160.

and Murphy to dispose of Murphy's civil suit.[79] According to Petitioner, the settlement agreement, which Scutti never read before or during trial and then either lost or concealed, would have totally undermined the government's case by nullifying its "agency" theory and impeaching Murphy's testimony.

It is unnecessary for the Court to comment on the deficiency of Scutti's representation related to this argument.[80] Whether or not Scutti was deficient by not realizing the government had provided him with the agreement during discovery, Petitioner cannot establish the prejudice required by Strickland on this point. Even if the failure to use the settlement agreement itself was not the result of a strategic decision, it was not a mistake so serious as to render Petitioner's trial unfair. For a number of reasons, it is apparent that there is not a reasonable probability that the result of the proceeding would have been different had Scutti recognized his receipt of the agreement, even if he would have eventually used it at trial.

First, even if Scutti had full knowledge of the agreement and its contents, he probably would not have offered its substance at trial. As Scutti testified at a previous Brady hearing and then again at the habeas evidentiary hearing, he was very reluctant to offer the settlement agreement

---

[79] The key excerpt from the settlement agreement reads as follows:

> After full and complete discovery and investigation, Mr. Murphy, ISE and Mr. Ellis agree that their failure to enter into a formal written agreement spelling out the parties' duties resulted in confusion and left it unclear what, if any, duties each party owed to the other parties in connection with their relationship and their transactions. Mr. Murphy, ISE and Mr. Ellis acknowledge and agree that they did not enter into a formal agency agreement specifying that either ISE or Mr. Ellis was to act as Mr. Murphy's agent. Mr. Murphy further acknowledges and agrees that the evidence as a whole does not support any claim of fraud or intentional misconduct against ISE and/or Mr. Ellis.

Ex. R to Pet. for Writ of Habeas Corpus, Confidential Settlement Agreement and Release, at 5.

[80] As the Supreme Court instructed in Strickland, when a court can more judiciously dispose of an ineffective-assistance claim for lack of sufficient prejudice, that course should be followed. 466 U.S. at 697.

because doing so would have presented the devastating possibility that Ellis, Petitioner's co-conspirator, would have been called to testify about his own guilty plea.[81] While the government would not have been permitted to present evidence of Ellis's guilty plea absent his trial testimony, Ellis was available and prepared to testify, and his attorney had actually made arrangements for him to be in Philadelphia on short notice, if required.[82] As a result, because there was a real possibility that Ellis would be put on the stand to testify about his guilty plea, and, as Scutti acknowledged, he could not "think of anything more devastating" than the "jury learn[ing] that [Ellis] pleaded guilty in a two-defendant conspiracy case,"[83] it is highly unlikely that Scutti would have offered the settlement agreement even if he was fully aware of its contents. In fact, at the evidentiary hearing, Scutti explicitly stated that the settlement agreement "was of no use" to him and that he would not have used the agreement.[84]

Second, even if Scutti had recognized and used the settlement agreement, its potential effectiveness in refuting the "agency theory" is questionable at best. The language of the agreement merely confirms that Murphy and Ellis did not enter a formal written agency agreement, a fact that Scutti was able to establish at Petitioner's trial without use of the settlement agreement.[85] The settlement agreement does not refute the existence of, at a minimum, a *de facto* agency relationship wherein Ellis was considered Murphy's "man" or "representative," in an exclusive relationship with

---

[81] N.T. Evidentiary Hr'g 10/5/06, at 202, 203, 211.

[82] Id. at 29 (testimony of Ellis's attorney, Joseph Dominguez).

[83] Id. at 202.

[84] Id. at 211.

[85] Id. at 196–97.

one another.[86] Insofar as the agreement attempts to absolve Ellis of any liability for fraudulent or intentional misconduct, the government could easily have counteracted the literal meaning of the clause by explaining the nature of civil-suit settlements and the standard inclusion of "no-admission-of-liability" provisions. The average juror is certainly able to understand, especially after explanation from the government, that concession statements made in a settlement agreement have limited force. Additionally, had Scutti used the agreement, the government could have called Ellis to testify that he pleaded guilty to being involved in a scheme to defraud Murphy, which would have destroyed any limited progress made by introducing the agreement.

Finally, even if the use of the settlement agreement could have successfully demonstrated that Ellis was not Murphy's agent, the issue of agency was not an essential element of the charged crime. While the government emphasized that the impropriety of Petitioner's conduct was exacerbated by Ellis's role as Murphy's agent, the illegal scheme to defraud was not founded solely on such a relationship, and Petitioner's guilt was evident with or without proof of the agency. As Goldman stated at the evidentiary hearing, the government's case did not "rise or fall on the agency issue alone," but rather, "[t]he core of the case was the false representations" included in the letters that were manufactured and then mailed; "that's the mail fraud."[87] The Court agrees that agency, while a relevant issue, was not a material element of the fraud, and its existence or lack thereof does not "eliminate the other facts that were proven to the jury"[88] and could be removed from

---

[86] See, e.g., N.T. Trial 12/12/03, at 50 (testimony of Martin Lane); see also N.T. Evidentiary Hr'g 10/5/06, at 208.

[87] N.T. Evidentiary Hr'g 10/5/06, at 62.

[88] Id. at 206.

the equation without nullifying the commission of a federal crime.[89] The mail-fraud and wire-fraud statutes require only a scheme or artifice to defraud by use of the mail or wire; it certainly does not require some fiduciary or agency relationship between the defrauders and the victim.[90] In this case, the agency relationship merely compounded the inappropriateness of Petitioner's conduct.

Because Petitioner cannot establish that Scutti's failure to recognize his receipt of the settlement agreement, and subsequent failure to use the agreement at trial, renders his conviction fundamentally unreliable or unfair, his ineffective-assistance-of-counsel claim cannot succeed.

## B. Alleged Brady/Jencks Act Violations

In addition to his numerous claims of ineffective assistance, Petitioner argues that his conviction should be vacated because of two alleged Brady violations[91] and one alleged Jencks Act violation by the government. After articulating the applicable law, the Court will individually address each of Petitioner's Brady and Jencks Act claims.

### 1. Brady Violations

#### *a. Legal Standard*

In Brady v. Maryland,[92] the United States Supreme Court held that "the suppression

---

[89] See id. at 207.

[90] See 18 U.S.C. § 1341 (2000).

[91] While the Petition itself alleges only one Brady violation, Petitioner, in later briefing, attempts to reassert an alleged Brady violation that was previously asserted in his Second Motion to Vacate Conviction filed on September 9, 2005 [Doc. #92]. The Court found this claim unmeritorious and denied the Petitioner's Motion on January 11, 2006. The denial was memorialized by Order of this Court dated January 23, 2006 [Doc. #122]. The Court will nonetheless readdress this claim herein.

[92] 373 U.S. 83 (1963).

by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[93] That holding has since been expanded to require disclosure even in the absence of a request by the accused[94] and to include impeachment evidence as well as exculpatory evidence.[95] Essentially then, there are three components of a Brady violation: (1) the evidence must be favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed, willfully or inadvertently, by the government; and (3) the evidence was material such that its nondisclosure prejudiced the defendant.[96]

As a result of the materiality requirement, "there is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."[97] As the Supreme Court explained in Strickler, a defendant challenging an alleged nondisclosure "must convince us that 'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense."[98] A key question is whether the defendant, in the absence of the undisclosed evidence, "received a fair trial, understood as a trial resulting in a verdict worthy of

---

[93] Id. at 87.

[94] Strickler v. Greene, 527 U.S. 263, 281 (1999) (citing United States v. Agurs, 427 U.S. 97, 107 (1976)).

[95] Id. (citing United States v. Bagley, 473 U.S. 667, 676 (1985)).

[96] See id. at 281–82.

[97] Id. at 281.

[98] Id. at 289. In Strickland, the Supreme Court adopted this same standard for determining whether a defendant claiming ineffective assistance of counsel was prejudiced by his counsel's errors or omissions. 466 U.S. at 694 (citing Agurs, 427 U.S. at 104). Accordingly, the test for prejudice in ineffective-assistance claims and Brady claims is virtually identical.

confidence."[99] Ultimately, the materiality inquiry requires courts to decide whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[100]

*b. Failure to Inform Petitioner That Ellis Continued to Deny Agency*

Petitioner first argues that the government improperly failed to disclose that Ellis continued to deny that he was Murphy's agent, even after pleading guilty and becoming a cooperating witness. Petitioner claims that Ellis's continued denials that he was Murphy's agent completely contradict the government's theory, and the fact that Petitioner was not informed of these repeated denials undermines confidence in the outcome of the trial.

Even if Ellis's "repeated denials" constitute exculpatory or impeaching information that the government would otherwise be required to disclose before trial, Petitioner has not established that the information was material such that its nondisclosure resulted in prejudice. Petitioner knew well before trial that Ellis refused to acknowledge that he was Murphy's agent. Any subsequent guilty plea or cooperation with the government did not nullify that knowledge. It is not a reasonable inference that Ellis's cooperation and guilty plea necessarily included an admission that he was Murphy's agent despite his vehement and continuous denial of that fact for several years prior.[101] He pleaded guilty to the fraudulent scheme and was willing to implicate Petitioner in the scheme. Neither of these acts required him to admit he was Murphy's agent. In fact, while

---

[99] Id. at 290 (internal quotations omitted).

[100] Kyles v. Whitley, 514 U.S. 419, 435 (1995).

[101] See, e.g., N.T. Evidentiary Hr'g 10/5/06, at 36, 39 (testimony of Joseph Dominguez explaining that Ellis was pleading guilty to a crime he believed he committed, not to the alleged agency, and that Dominguez could not agree that a reading of the plea-hearing transcript necessarily suggests Ellis was admitting the agency).

Petitioner tries to minimize this point, at Ellis's February 24, 2003 plea hearing, Ellis's lawyer specifically noted his client's disagreement with blanket claims that he was Murphy's agent.[102] This was noted on the record even after the Court instructed counsel to work together with the Probation Department to develop a presentence report that included an accurate recitation of the facts underlying the plea agreement, rather than go through each point with the Court.[103] Well before Petitioner's trial, he and Scutti received a copy of the transcript of the plea hearing and were aware of Ellis's objection to the government's claim of agency.[104] As a result, Petitioner had notice that the information previously disclosed by the government—that Ellis refused to admit that he was Murphy's agent—had not changed, and he proceeded to trial with that knowledge.

Furthermore, Scutti's trial strategy would not have changed even if he had possessed specific information that Ellis continued to deny agency after entering the cooperation agreement and guilty plea. Perhaps Petitioner would have a viable argument had defense counsel decided not to challenge the agency at trial because he believed Ellis had admitted to being Murphy's agent. There are, however, numerous points in the trial transcript where Scutti questions the agency.[105] It is clear from the record that Scutti was willing to attack the alleged agency relationship with or without specific knowledge of Ellis's current position on the issue. Additionally, even specific information about Ellis's continued denials would not have mitigated Petitioner's own admission, in his sworn

---

[102] See Ex. S to Pet. for Writ of Habeas Corpus, N.T. Change of Plea Hr'g 2/24/03, at 36.

[103] See id. at 35.

[104] See N.T. Evidentiary Hr'g 10/5/06, at 199.

[105] See, e.g., N.T. Trial 12/10/03, at 190–91 (questioning agency for Walker 1009 transaction); id. at 206 (questioning agency in absence of written agreement); id. at 207 (questioning exclusivity of Ellis's agency); N.T. Trial 12/12/03, at 50–51 (questioning Lane about agency and attempting to analogize by inference Lane's relationship with Murphy to Ellis's former relationship with Murphy).

statement, that Ellis was acting as Murphy's agent,[106] nor nullified the fact that he had made that same admission to Scutti.[107] The nondisclosure did not dissuade defense counsel from pursuing the issue at trial to the fullest extent given the circumstances of the case. Accordingly, even if the alleged Brady material had been disclosed, defense counsel's strategy and representation at trial would have been unaffected.

Furthermore, the persuasive power of Ellis's further denials of agency is extremely limited. Ellis's continued denials would not have helped to overcome the evidence that there was, in fact, an agency relationship, such as the testimony of members of the antique-firearms community about the agency[108] and the course of dealing between Ellis and Murphy demonstrated by the testimony in the case. Additionally, as mentioned above, Petitioner personally acknowledged Ellis's agency relationship with Murphy in his sworn statement,[109] which was read to the jury, and to his defense counsel.[110] Nonetheless, Scutti attempted to refute the evidence of agency at trial, but his attempt could not have been more vigorous or more persuasive if he had been specifically informed that Ellis continued to deny agency.

Accordingly, the Court cannot find that Ellis's statements denying agency after he entered his guilty plea "could reasonably be taken to put the whole case in such a different light as

---

[106] See Ex. G-37 at Trial 12/11/03, Sworn Statement of Michael R. Zomber, Oct. 1, 2001, at 8–9.

[107] See N.T. Evidentiary Hr'g 10/5/06, at 186–87 ("Mr. Zomber told me [Ellis] was [Murphy's agent].").

[108] See, e.g., N.T. Trial 12/11/03, at 174–75, 176 (testimony of John Gangel); N.T. 12/12/03, at 50 (testimony of Martin Lane).

[109] See Ex. G-37 at Trial 12/11/03, Sworn Statement of Michael R. Zomber, Oct. 1, 2001, at 3–17.

[110] N.T. Evidentiary Hr'g 10/5/06, at 186–87.

to undermine confidence in the verdict."[111] Even without the government specifically informing Petitioner of Ellis's continued denial, Petitioner received a fair trial. As a result, because Petitioner cannot establish prejudice, he has not established a "real Brady violation."[112]

*c. Failure to Disclose the "Gates Letters"*

Petitioner also argues that the government was required, under Brady, to disclose two letters written by Murphy to Microsoft Chairman Bill Gates.[113] Only the first letter, dated December 21, 2000, included any substantive discussion relevant to Petitioner's trial. In this letter, Murphy offered to sell his entire collection of Colts to Gates "at cost with no traditional markup and no dealer commission."[114] Petitioner claims that this statement was exculpatory and/or could have been used to impeach Murphy, and also that this statement should have been disclosed under the Jencks Act.[115]

The Court finds Petitioner's claim that the government violated Brady by failing to disclose these letters unconvincing. Assuming, *arguendo*, that the letters constitute "Brady material," Petitioner still cannot establish that "there is a reasonable probability that the suppressed evidence would have produced a different verdict."[116] The value of the letters is questionable. While Murphy offers to sell his collection at cost, nowhere does he promise that the collection is worth what he paid for it, nor does he suggest that he has an alternative buyer who is ready and willing to

---

[111] Kyles, 514 U.S. at 435.

[112] Strickler, 527 U.S. at 281 (internal quotations omitted).

[113] Ex. SC-46 at Evidentiary Hr'g, Letter from Joseph A. Murphy to William Gates (Dec. 21, 2000); Ex. SC-47 at Evidentiary Hr'g, Letter from Joseph A. Murphy to William Gates (Jan. 17, 2001).

[114] Ex. SC-46 at Evidentiary Hr'g.

[115] The Court will conduct a Jencks Act analysis below in Section II.B.2.

[116] Strickler, 527 U.S. at 281.

pay cost for the collection. A simple offer to sell at a price is, similarly, not necessarily a suggestion that he believes the collection to be worth all that he paid for it. Scutti may have been able to ask Murphy about this letter on cross-examination, but as Scutti explained, getting Murphy to "bite on this . . . would have been a real change of heart for Murphy because he wasn't biting on a lot of stuff. And you'll see a lot of questions where I start down the road, and I didn't like where it was going, and then I would move to something else . . . ."[117] In fact, Scutti expressed his doubt about the effectiveness of using the Gates letters on cross-examination of Murphy.[118] Given the quality of Murphy's testimony on direct and cross-examination—as Scutti described him, he was a "tough witness," a "very good witness," a "very sympathetic witness,"[119] and a "very formidable witness,"[120]—the letters would have done very little to impeach his extensive testimony. That use of the letters on cross-examination may have made a very minor impact on Murphy's well-established credibility is not sufficient to render Petitioner's trial constitutionally unfair, such that the Court's confidence in the jury's guilty verdict is undermined.

Accordingly, the Court finds that the government's failure to supply the Gates letters does not constitute a Brady violation, as Petitioner is unable to establish the requisite prejudice.

**2. Jencks Act Violation**

Additionally, Petitioner claims that the government's failure to timely disclose the

---

[117] N.T. Evidentiary Hr'g 10/5/06, at 252.

[118] See id. at 250–52.

[119] Id. at 254.

[120] Id. at 175.

Gates letters was a violation of the Jencks Act.[121] He asserts that the statements Murphy made in the Gates letters constitute "statements" under the Act and, therefore, the letters should have been supplied pretrial.

*a. Legal Standard*

By statute, the government is required to "produce any statement . . . of [a] witness in the possession of the United States which relates to the subject matter as to which the witness has testified."[122] This statute was promulgated in response to the Supreme Court's decision in Jencks v. United States,[123] in which the United States Supreme Court required the government to turn over the contents of oral and written reports made by F.B.I. informants who testified against a criminal defendant. The statute was enacted out of concern that district courts would misinterpret or misunderstand the proper application of the Jencks decision,[124] and that an over-expansive reading of the decision would compel undiscriminating production of agents' summaries of interviews.[125] An examination of cases applying the Jencks Act reveals that it applies to statements given to or taken by government agents, or reports created by government agents, that directly relate to the witness's testimony at trial. In fact, the only cases to which Petitioner cites in his memoranda of law on this point involve actual "statements" given to government officials, not tangential statements

---

[121] 18 U.S.C. § 3500 (2000).

[122] Id. § 3500(b).

[123] 353 U.S. 657 (1957).

[124] Goldberg v. United States, 425 U.S. 94 (1976).

[125] Palermo v. United States, 360 U.S. 343 (1959).

made in a witness's ordinary course of everyday activity.[126] There is no indication that the Jencks Act encompasses collateral statements made in a letter that is totally unrelated to the criminal investigation or the proffered content of the witness's eventual testimony.

*b. Failure to Disclose the "Gates Letters"*

Petitioner argues that "[t]here is no question" that the letters Murphy sent to Gates, one of which included an offer to sell his entire firearms collection to Gates "at cost," are Jencks Act material that the government was clearly required to provide to defense counsel.[127] According to Petitioner, the letters included statements "'which relate to the subject matter as to which the witness has testified.'"[128]

The Court disagrees. Petitioner has not cited a single case in which the Jencks Act was found to apply to tangential letters or other documents that were not sent to or provided to an investigating officer, agent, or prosecutor. The Jencks Act was enacted to deal specifically with actual statements given to government officials by potential witnesses. For example, if Murphy had met with investigating agents or government prosecutors and made a statement about the value of his firearms collection, the Jencks Act would require the government to disclose that statement to defense counsel. Similarly, if Murphy had written a letter to Special Agent Wittman—one of the F.B.I. agents investigating the conspiracy—in which he made a statement concerning the value of

---

[126] See United States v. Ferreira, 625 F.2d 1030, 1033 (1st Cir. 1980) (considering whether prior "statement which were taken from the witness, Michael McDonough, during his first contact with the F.B.I.," were related to the witness's testimony); United States v. Derrick, 507 F.2d 868, 871 (4th Cir. 1974) (considering whether new trial was required as a result of nondisclosure of all three statements made by testifying witness to special agent of the F.B.I. who investigated crime).

[127] See Petr.'s Post-Hr'g Reply Mem. of Law, at 7.

[128] Id. (quoting 18 U.S.C. § 3500(b)).

his collection, the Jencks Act would likely require disclosure of that letter. For instance, it was the Jencks Act that required Goldman to disclose the FD-302 forms created by Special Agent Wittman pursuant to his interviews with Ellis and Sweeney.[129] The Jencks Act does not, however, require disclosure of a letter, unrelated to the criminal investigation or prosecution, sent to an uninterested third party. The Court does not believe that an offer for sale included in a letter to a third party, wholly unrelated to the government's investigation, constitutes a "statement" under 18 U.S.C. § 3500. Frankly, the Court finds Petitioner's repeated insistence that the letters are clearly Jencks Act material disingenuous. In the absence of any citation to applicable legal precedent, and after a careful reading of the statute and related case law, the Court cannot agree that the government was required to disclose either of the Gates letters under the Jencks Act.

**C. Cumulative Effect of Alleged Deficiencies at Trial**

In a final attempt to obtain a new trial, Petitioner argues that, if his none of his arguments are alone sufficient to warrant vacatur of his conviction, the cumulative effect of the errors rendered his trial unfair. As a result, he argues, his conviction should be vacated and he should be afforded a new trial.

A new trial is required on the basis of the cumulative-error doctrine only when the "errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial."[130] Even when there were numerous errors at trial, those errors will not require a new trial in the face of overwhelming evidence of guilt, and as long as the defendant was

---

[129] See Ex. GX-3 at Evidentiary Hr'g, at 1, Cover Letter from Robert E. Goldman to Gilbert Scutti (Nov. 26, 2003).

[130] United States v. Hill, 976 F.2d 132, 145 (3d Cir. 1992).

not deprived of a fundamentally fair trial.[131] While there are a number of approaches to evaluating cumulative-error claims,[132] Petitioner suggests that the Court should adopt the approach in which it would "cumulate all errors, whether constitutional or state law, and ask whether the cumulative effect of these errors, in light of the trial as a whole, creates a reasonable probability that the result of the proceeding would have been different."[133]

Here, the Court cannot grant Petitioner a new trial based on the cumulative-error doctrine because, even embracing the test offered by Petitioner, the "errors" at trial are not sufficient to create a reasonable probability that the result of the proceeding would have been different. Considering the individual issue analyses conducted by the Court above, there is only one potential error to "be cumulated." While the Court has not established whether Scutti's failure to recognize that he had received the Settlement Agreement actually constituted deficient representation, it has established that this potential error was harmless because the Petitioner was not prejudiced as a result. The Court has determined that all other conduct alleged to constitute ineffective assistance did not, in fact, amount to deficient representation. Furthermore, the Court has determined that neither of the alleged Brady violations were "real Brady violations,"[134] and that the government did not violate the Jencks Act by not disclosing the Gates letters. As a result, the only potential error

---

[131] United States v. Copple, 24 F.3d 535, 547 n.17 (3d Cir. 1994).

[132] See Pursell v. Horn, 187 F. Supp. 2d 260, 374–76 (W.D. Pa. 2002) (identifying and discussing the various approaches).

[133] Petr.'s Post-Hr'g Reply Mem. of Law, at 8 (internal quotations omitted); see id. at 9 ("Accordingly, this Court should decide whether there is a reasonable probability that the result of Mr. Zomber's trial would have been different in the absence of all of the trial errors combined.").

[134] Strickler, 527 U.S. at 281 (internal quotations omitted) (establishing that there is no real error or violation unless sufficient prejudice ensues).

was Scutti's handling of the Settlement Agreement. The Court's determination that this potential error was harmless, as it did not render Petitioner's trial unfair or create a reasonable probability that the result of the trial would have been different had Scutti acted differently,[135] effectively eliminates Petitioner's claim that he is entitled to a new trial based on the cumulative effect of all the errors at trial.

**C. Certificate of Appealability**

Finally, in anticipation of a likely appeal of the rulings in this Opinion, the Court must determine whether it is appropriate to issue a certificate of appealability.

Under 28 U.S.C. § 2253 and Federal Rule of Appellate Procedure 22(b), a § 2255 petitioner cannot take an appeal from the denial of his or her petition in the absence of a certificate of appealability. As the Supreme Court of the United States has announced, "§ 2253(c) permits the issuance of a COA [certificate of appealability] only where a petitioner has made a substantial showing of the denial of a constitutional right. . . . Under the controlling standard, a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."[136] The petitioner is not required to make a showing that the appeal will succeed on the merits, but he or she must "prove something more than the absence of frivolity or the existence of mere good faith on his or her part."[137] In a case where petitioner's claims

---

[135] See Section II.A.2.k.

[136] Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) (internal quotations omitted).

[137] Id. at 338 (internal quotations omitted).

are rejected on their merits, the standard is clear: "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[138]

In this case, the Court finds that the Petitioner has failed to meet this standard and, therefore, it will not issue a certificate of appealability. Petitioner has not made a substantial showing that one of his constitutional rights was denied. Nor does the Court believe that reasonable jurists could find its assessment of the claims debatable or wrong. Petitioner's claims—of ineffective assistance of counsel, Brady/Jencks Act violations, and cumulative error— are fairly straightforward, and the applicable law simply does not embrace them. Accordingly, the Court does not believe that probable cause exists warranting the issuance of a certificate of appealability.

## III. CONCLUSION

In its constant pursuit of justice and fairness, underscored in the case of a criminal defendant, the Court has invested much time and effort in its consideration of Petitioner's numerous claims for vacatur of his conviction and a new trial. The Court has concluded, however, that numerous seriatim claims of error, raised in hindsight evaluation of what new or different trial counsel may have done, cannot be the basis of relief in our system of habeas corpus review. Neither can repetitive allegations of error made in multiple and often duplicative filings with this Court sufficiently controvert what is patently obvious to the Court: that Petitioner was afforded a fair and reliable trial and, therefore, his claims are wholly without merit. Consequently, after additional review and careful consideration of the Petition for Writ of Habeas Corpus, the Court has determined that Petitioner is not entitled to such relief. An appropriate Order follows.

---

[138] Slack v. McDaniel, 529 U.S. 473, 484 (2000).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL ZOMBER,** Petitioner, | : | |
| v. | : | **CRIMINAL NO. 03-046-2** **CIVIL NO. 06-460** |
| **UNITED STATES OF AMERICA,** Respondent. | : | |

**ORDER**

**AND NOW**, this 19th day of March 2007, upon consideration of Michael Zomber's Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2255 [Doc. # 130], the Government's Response thereto [Doc. #183], Petitioner's Reply [Doc. # 185], Petitioner's Post-Hearing Memorandum of Law [Doc. # 189], the Government's Response thereto [Doc. # 190], and Petitioner's Post-Hearing Reply [Doc. # 191], and after a day-long evidentiary hearing, it is hereby **ORDERED** that the Petition for Writ of Habeas Corpus is **DENIED**.

It is **FURTHER ORDERED** that there is no probable cause to issue a certificate of appealability in this case.

The Clerk of Court shall **CLOSE** Civil Action No. 06-460, and Criminal Action No. 03-046-2 shall **REMAIN CLOSED**.

It is so **ORDERED**.

**BY THE COURT:**

**/s/ Cynthia M. Rufe**
**CYNTHIA M. RUFE, J.**